**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SAMERIA PERSON,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02491-SO<br><br>JUDGE SOLOMON OLIVER, JR.<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Sameria Person challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Nov. 17, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Person applied for DIB and SSI on July 5, 2023, alleging disability beginning July 31, 2022. (Tr. 271, 273). After her claims were denied initially and on reconsideration, Ms. Person requested a hearing before an Administrative Law Judge. (Tr. 148, 152, 163, 167, 170). On August 27, 2024, Ms. Person (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 37-63). On September 25, 2024, the ALJ determined Ms. Person was not disabled. (Tr. 17-31). On September 16, 2025, the Appeals Council denied Ms. Person's request for review

of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Person timely filed this action. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Person was 45 years old on the alleged onset date and 47 years old at the administrative hearing. (*See* Tr. 90, 45). She graduated high school and has past relevant work experience as a warehouse worker and a fast-food worker. (*See* Tr. 45, 58).

### II. Relevant Medical Evidence[1]

In July 2022, Ms. Person went to the emergency room after a motor vehicle collision. (Tr. 524). She complained of mid-neck and back pain since the collision and ongoing hand numbness and arm radiculopathy that has been present "for years." (Tr. 524-25). An MRI of her cervical spine taken that month revealed moderate-to-severe central canal stenosis at the C4-C5 level and severe central canal stenosis at the C5-C6 level. (Tr. 537). Ms. Person "had a discussion with neurosurgery and ultimately declined surgical management" and was discharged to follow up with outpatient care. (Tr. 763).

In August 2022, Ms. Person met with Kevin Kawalec, M.D., her primary care physician at University Hospitals, and explained she left the hospital against medical advice because "she was not psychologically prepared for" surgery. (Tr. 436). A physical examination noted "antalgic movements of the entire body"; "exquisite" tenderness to palpation of her cervical, thoracic, and lumbar spine; and a reduced range of motion from pain. (*See id.*). She was prescribed medication

[1] Although Ms. Person claimed disability in part due to mental impairments, she challenges only the ALJ's evaluation of her physical impairments. I limit my discussion of the record accordingly.

and Dr. Kawalec encouraged her to return to neurosurgery for an evaluation of her neck and spine. (Tr. 437). Dr. Kawalec completed a physician statement from Ms. Person's employer, stating after returning to work in September, she should be placed on modified duty through December, during which she cannot lift "objects over 0 pounds" and she "must be seated in a chair with lumbar support." (Tr. 678).

In September, Ms. Person met with Charles Gallagher, M.D., at University Hospitals for follow-up care from the accident and reported she was ready to reach out to a neurosurgeon. (Tr. 440-41). During the appointment she sat in a wheelchair and rated her back and neck pain as 7/10. (Tr. 443). Dr. Gallagher completed a similar work form extending Ms. Person's modified duty to begin in October and continue through January with the same accommodation. (Tr. 440, 697; *see also* Tr. 678).

In October, Ms. Person returned to University Hospitals for follow-up care and met with another doctor in the practice. (Tr. 444). She reported the same neck, arm, and leg pain with no improvement as well as tingling and numbness in her hands. (Tr. 445). She tried physical therapy twice but found it unhelpful and she had scheduled a neurosurgery appointment later in October. (*Id.*). A physical examination noted she was sitting comfortably in a wheelchair, had intact sensation and full motor strength in her arms, and exquisite pain in her legs. (Tr. 447). She rated her pain as 8/10. (*Id.*). She was prescribed muscle relaxers, pain medication, and a medication for hypertension and referred for a physical-occupational capacity evaluation for her work forms. (Tr. 445).

In December 2022, Ms. Person returned to Dr. Kawalec. (Tr. 448). She reported wanting to work but "even [the] simplest housework causes pain if it involves her arms." (*Id.*). She was

tearful during the physical examination, which noted tingling at the C8-T1 level; no gross abnormalities in motor strength, balance, and gait; mild arm weakness; limited extension and flexion of her shoulders due to pain; and significant tension in her neck, back, and shoulders. (Tr. 449). She rated her pain at 8/10. (Tr. 451). Dr. Kawalec prescribed a TENS unit and noted he completed a work form. (Tr. 449).

Also in December, Ms. Person met with a neurologist for an evaluation of her degenerative cervical spinal stenosis. (Tr. 505). She was in a wheelchair and reported using a cane at home and having difficulty walking long distances. (Tr. 506). A physical examination noted an antalgic gait, abnormal station, reduced muscle strength in her triceps, reduced reflexes, and pain when extending her cervical spine. (Tr. 508). The neurologist assessed Ms. Person with "notable cord compression from disc/osteophyte C5/6 > C4/5; mild weakness, notable pain, [numbness/tingling], and myelopathy on exam." (Tr. 506). Ms. Person was sent back to the neurosurgeon that saw her when she was hospitalized to discuss surgical options. (Tr. 505).

Later in December, Ms. Person participated in a functional capacity evaluation performed by Michelle Godek, AT, Ph.D., and Jamie Hart, PT, AT, DPT. (Tr. 589). She demonstrated full effort. (Tr. 589). She was assessed as having a workday limited to four hours; could sit for four hours during a workday and 60 minutes at a time; stand for zero hours in a workday (though it was also noted she could stand for five minutes at a time); walk for one-to-two hours for occasional short distances; lift up to 10.4 pounds with audible pain noises; push/pull 24.5 pounds; and occasionally handle. (Tr. 590, 592). She exhibited antalgic gait while carrying items and a reduced range of motion in her neck. (Tr. 593).

Ms. Person returned to Dr. Kawalec in January 2023 for a follow-up for her back and neck pain. (Tr. 452). She reported she was overwhelmed by the neurologist's suggestion of spinal surgery "as the only realistic option" and she had a repeat consultation later that week. (Tr. 453). She reported continuing pain and rated it as 8/10. (Tr. 452). She was tearful during the physical examination, which noted tingling at the C8-T1 level; no gross abnormalities in motor strength, balance, and gait; limited extension and flexion of her shoulders due to pain; and significant tension in her neck, back, and shoulders. (Tr. 453). She reported muscle relaxers and pain medications helped but she ran out of medications and could not afford the TENS unit. (*Id.*).

Later in January, Ms. Person had a neurosurgery evaluation with a different provider. (*See* Tr. 464). She reported weakness in her triceps, right more than left; occasionally dropping things; and constant numbness and tingling in her middle, ring, and pinky fingers. (*Id.*). The neurosurgeon reviewed the 2022 MRI of Ms. Person's cervical spine and assessed her with calcified discs at the C4-C6 levels with signs of myelopathy and recommended she follow up with the neurosurgeon from her 2022 hospitalization. (Tr. 463).

On March 30, 2023, Dr. Kawalec wrote a letter stating that Ms. Person is "in the process of extensive medical and surgical work up for her condition" and excusing her from work until June 1, 2023, or pending further recommendations from her physicians. (Tr. 703).

In July 2023, Ms. Person presented to Olufunso Adeniran, M.D., a family medicine practitioner, to treat her cervicalgia and fibromyalgia and to complete FMLA paperwork. (Tr. 460). Ms. Person reported pain radiating from her neck into her shoulders and hands and her hands locking up. (*Id.*). A physical examination noted no motor weakness, but a positive Spurling's test (a test for cervical radiculopathy), a positive empty-can test (a test for rotator-cuff pathology), and

tenderness over the left supraspinatus muscle (one of the four muscles in the rotator cuff). (*See* Tr. 460-61). Dr. Adeniran assessed Ms. Person with neck, shoulder, and hand pain from myelopathy due to cervical stenosis. (*See* Tr. 461). Dr. Adeniran prescribed daily ibuprofen, held off on referring Ms. Person to physical therapy until neurosurgery approved it, and noted "FMLA paperwork to be filled as patient unable to stand for prolonged periods and unable to lift heavy objects." (Tr. 461).

In November 2023, Ms. Person consulted with Manish Kasliwal, M.D., the neurosurgeon who treated her during her June 2022 hospitalization. (Tr. 487; *see also* Tr. 464). Ms. Person reported her neck pain gradually worsened since June 2022, radiated from her neck into her arms and hands, and is worsened by standing or walking for more than five minutes. (Tr. 487). She rated her pain as 8/10. (*Id.*). A physical examination noted a wide-based staggering gait, impaired tandem gait, diffuse weakness in her arms and legs, reduced hip flexion, reduced reflexes, and diminished sensation. (*Id.*). Dr. Kasliwal diagnosed Ms. Person with cervical myelopathy and recommended cervical surgery. (Tr. 489-90).

On January 31, 2024, Ms. Person went to the emergency room two weeks after she dropped a knife on her left foot and presented with severe swelling in her left leg and the wound in her foot was not healing. (Tr. 962). She reported she "normally walks with cane" but "is now struggling more with ambulation due to pain." (*Id.*). A physical examination documented a 1.5 cm triangular wound on the top of her left foot; substantial surrounding erythema (redness), warmth, and swelling; erythema up to the top of her calf; severe tenderness to palpation; and a normal range of motion in her neck. (Tr. 963-64). She was prescribed medications and admitted to the hospital. (Tr. 974). She was diagnosed with chronic venous insufficiency and left proximal deep

vein thrombosis with post-thrombotic syndrome. (Tr. 975). Over the course of her hospitalization, an ultrasound of her left leg did not reveal any acute blood clots and a CT scan of her left leg and foot showed some tissue edema without any fluid collections or bony involvement or gas in the tissues. (Tr. 980). Her swelling "appear[ed] to be due to previous clot causing the valves to be damaged—called venous insufficiency." (*Id.*). After improvement, Ms. Person was discharged with instructions to follow up with her primary-care physician, to "keep [her] legs (especially the left one) 2 to 3 inches above the level of the heart, during the nighttime," and "wear compression stockings during the daytime" due to "the venous insufficiency in [her] left leg because of [her] old clot." (*Id.*).

Ms. Person followed up with Dr. Kawalec on February 22. (Tr. 726). She complained of increased swelling and significant pain in her left foot. (*Id.*). A physical examination showed a 5 millimeter by 5 millimeter round ulcerated lesion on the middle top of her left foot with purulent discharge, non-pitting edema, and significant tenderness to palpation. (Tr. 727). She was diagnosed with cellulitis in her left leg. (Tr. 728).

In March, Ms. Person returned to the emergency room for a wound check. (Tr. 805). She reported her foot pain had improved but returned to "where it was when this first happened." (*Id.*). She also had difficulty walking with her left foot. (*Id.*). A physical examination showed a nonhealing ulceration on the top of her left foot; no purulence, erythema, warmth, or discharge; and moderate nonpitting edema with some discoloration around the wound site. (Tr. 806). A CT scan of her ankle showed cellulitis and mild edema of the lower leg and an MRI showed confluent cellulitis of the dorsal foot and anterior ankle. (*Id.*; *see also* Tr. 811). After discharge, she was

recommended to clean and dress the wound daily and "[e]levate heels off the bed surface at all times." (Tr. 816).

Ms. Person followed up for wound care in April. (Tr. 802). She reported taking all her medications, elevating her legs when laying down, and her swelling and wound size improved, but her pain increased when walking sometimes causing "cracking" of the wound which in turn causes bleeding and worsening pain. (Tr. 803). A physical examination noted she was in acute distress, tearful, edema in the left leg from the foot to ankle, "exquisitely" tender to touch, and a linear ulcerated lesion on top of her left foot but no non-pitting edema, purulent drainage, or bleeding. (*Id.*). Ms. Person was assessed with resolved cellulitis and abscess of the left lower extremity, a non-healing ulcer, and history of deep vein thrombosis. (*Id.*).

Ms. Person returned to the emergency room later that month after she awakened due to severe abdominal pain and worsening leg swelling. (Tr. 869). A physical examination noted poor healing of her foot wound, leg swelling, chronic venous insufficiency in her legs, and abdominal pain and tenderness. (Tr. 880-81). The abdominal pain was determined to be a condition unrelated to her claim for benefits and she was discharged after it was treated. (Tr. 888). She was recommended to continue with her wound-care treatment. (*Id.*).

In June, Ms. Person returned to Dr. Kawalec's practice for wound care. (Tr. 1057). Her wound appeared to be improving with decreased swelling and necrotic-appearing tissue, but she still complained of chronic pain. (Tr. 1059). She was encouraged to follow up with a podiatrist or wound clinic. (*Id.*). In August, a physician at Cleveland Foot & Ankle Clinic submitted a letter stating Ms. Person had begun treatment that month, was diagnosed with a left foot ulceration, and should not work from August 21 through November 21, 2024. (Tr. 406).

## III. Opinion Evidence

On October 30, 2023, state agency medical consultant Lynne Torello, M.D., reviewed Ms. Person's file and opined the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for about six hours each in an eight-hour workday; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, crouch, and crawl; limited in reaching with both arms; and must avoid all exposure to workplace hazards such as unprotected heights, commercial driving, or dangerous machinery. (Tr. 98-99, 111-12). On reconsideration review on February 23, 2024, state agency medical consultant Rohini Mendonca, M.D., reviewed updated medical records and opined Ms. Person can lift and carry 50 pounds occasionally and 25 pounds frequently but otherwise affirmed Dr. Bolz's findings. (Tr. 101-02, 111-12).

In January 2023, Dr. Kawalec adopted the limitations included in the functional capacity evaluation by Drs. Godek and Hart. (Tr. 453; *see also* Tr. 589-93). Accordingly, Dr. Kawalec opined Ms. Person could work up to four hours a day; sit for four hours in a workday and for an hour at a time; stand for zero hours in a workday and for no more than 5 minutes at one time; walk occasional short distances; lift no more than eight pounds over her shoulders occasionally; lift no more than 10 pounds while seated in a chair occasionally; push no more than 10 pounds and pull no more than 24 pounds; carry no more than 6 pounds; and never climb stairs, crouch, crawl, bend, or stoop. (Tr. 453).

On August 1, 2023, Dr. Adeniran completed an FMLA form, opining that for a period of five months (May 1 to October 1, 2023) Ms. Person was unable to lift any weight for any amount of time; could perform repetitive motion or grip with her hands for 20 minutes each in a workday;

and could never reach, bend, pivot, kneel, crawl, squat, sit, stand, walk, climb stairs, or climb stepstools. (Tr. 410-11).

## IV. Testimonial Evidence

Ms. Person explained she stopped working after her back was "messed up really bad" in a motor vehicle accident where she was T-boned by a driver running a red light. (Tr. 51). Her work involved standing over a 10-hour shift and her back would hurt and burn after standing for just 10 to 15 minutes. (*Id.*). Her doctors submitted paperwork to her employer for temporary leave and extended her leave each time it expired. (*See id.*).

Ms. Person attended physical therapy for her neck and back, but she limited her movements on advice of her doctor to avoid potential paralysis. (*See* Tr. 52). Her doctors recommended surgery, but before she was scheduled to have the procedure, she dropped a knife that stabbed her in the foot. (*Id.*). Since then, the injury would not heal, and her leg kept swelling despite medications and dressing the wound. (*See* Tr. 52-53). To help it heal, her doctors reopened the wound to inject collagen. (Tr. 53). Her doctors routinely monitor the swelling in her wounded leg because she had blood clots previously in that leg as well as a history of deep vein thrombosis and a pulmonary embolism. (Tr. 52-53).

Ms. Person lives alone and though she can do household chores such as cleaning, laundry, and cooking on her own, she has help from her two adult daughters. (Tr. 45, 54). A neighbor does the yardwork for her. (Tr. 55). In the months leading up to the hearing, she had been bedridden with her foot elevated because her leg had been swelling so much. (Tr. 55).

A typical day for Ms. Person depends on her back pain. (*See* Tr. 56). If her back does not hurt too bad, she will go out and get breakfast or coffee, return to bed for a while, and eventually

move out to her porch for an hour or so. (*Id.*). She stays in the house and watches TV or reads on most days and has not gone out with her family due to her foot. (*Id.*).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do

other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

**THE ALJ'S DECISION**

At Step One, the ALJ determined Ms. Person had not worked since the alleged onset date. (Tr. 20). At Step Two, the ALJ identified degenerative disc disease, hypertension, obesity, and cellulitis as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Person's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 23-24). At Step Four, the ALJ determined Ms. Person's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows.
>
> From the alleged onset date of July 31, 2022, through August 27, 2023, the claimant could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit up to six hours and stand/walk up to six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. She could have frequent exposure to vibration and to hazards of unprotected heights and dangerous moving machinery, as well as commercial driving.
>
> From August 28, 2023, to the present, the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for four hours out of an eight-hour workday, and sit for six hours out of an eight-hour workday. She can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She can occasionally perform bilateral overhead reaching, as well as front and lateral reaching. She can be frequently exposed to extreme cold, wetness, and vibration. She can never be exposed to hazards of unprotected heights and dangerous moving machinery.

(Tr. 24) (paragraph separations added). The ALJ then found Ms. Person could perform her past relevant work as a warehouse worker and fast-food worker until August 27, 2023; after that date, she could work as a fast-food worker but not as a warehouse worker. (Tr. 28-29). Thus, the ALJ concluded Ms. Person was not disabled at Step Four. (*Id.*). In the alternative, the ALJ proceeded to

Step Five and found Ms. Person could perform other work, including as a general office clerk, information clerk, and inspector. (Tr. 30). Thus, the ALJ concluded Ms. Person was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by

the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Ms. Person argues the ALJ erred by not considering her non-severe impairments of deep vein thrombosis and chronic venous insufficiency. (ECF #9 at PageID 1156). She also argues the ALJ erred in not considering whether she met Listing 4.11. (*Id.*). Third, she argues the ALJ misevaluated Dr. Adeniran's medical opinion as well as Dr. Kawalec's medical opinion and the December 2022 FCE report on which that opinion was based. (*Id.* at PageID 1165).

**I. Consideration of non-severe impairments**

First, Ms. Person argues remand is warranted because the ALJ did not mention her deep vein thrombosis or chronic venous insufficiency anywhere in the decision. (ECF #9 at PageID 1157-63). The Commissioner responds that the ALJ considered those conditions without mentioning them because the state agency consultants considered them and the ALJ found their opinions to be persuasive. (ECF #10 at PageID 1175). Ms. Person responds the state agency consultants' review was completed before her foot injury in 2024 that was aggravated by her vascular conditions and the ALJ did not consider her need to elevate her leg. (ECF #11 at PageID 1184-85).

At Step Two of the sequential evaluation process, the ALJ considers the claimant's impairments to establish whether the claimant has a severe medically determinable impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

First, the ALJ must consider whether the claimant has a medically determinable impairment, *i.e.*, an impairment resulting from anatomical, physiological, or psychological abnormalities, shown by medically acceptable clinical and laboratory diagnostic techniques. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 416.920(a)(4)(ii), 416.921. If an alleged impairment is not medically determinable, then an ALJ need not consider that impairment in assessing the RFC. *See Rouse v. Comm'r of Soc. Sec.*, No. 2:16-cv-223, 2017 WL 163384, at *4 (S.D. Ohio Jan. 17, 2017) (stating that a "claimed condition which is not 'medically determinable' need not be considered at all" in determining a claimant's RFC); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

Second, the ALJ considers whether the medically determinable impairment is severe. *See* 20 C.F.R. §§ 404.1521, 416.921. A severe impairment is one that significantly limits the claimant's

ability to perform basic work activities, and must result in death or must last or be expected to last at least 12 consecutive months. 20 C.F.R. §§ 404.1509, 404.1520(d), 404.1522(a), 416.909, 416.920(d), 416.922(a).

In the Sixth Circuit, the severity determination at Step Two is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id*. The goal of the test is to "screen out totally groundless claims." *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

Because a claim continues after the ALJ finds at least one impairment is severe, "[t]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" when other impairments are severe. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (quotation omitted). Thus, if an ALJ wrongly finds an impairment not to be severe at Step Two, that error is harmless provided the ALJ properly considers that non-severe impairment at later steps. *Id.* (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The record shows Ms. Person has been diagnosed with deep vein thrombosis in her left leg since at least 2015 and has received treatment from at least 2020. (*See* Tr. 662). The ALJ did not state at Step Two whether Ms. Person's deep vein thrombosis or chronic venous insufficiency were not medically determinable impairments or if they were medically determinable but not severe. (*See* Tr. 20-23). The ALJ did not mention those conditions at all, instead discussing Ms. Person's chalazion, diverticulitis, and mental impairments. (*See* Tr. 20-23). The most explanation the ALJ offered regarding deep vein thrombosis and chronic venous insufficiency is the ALJ's introductory

remark that "[t]he above medically determinable impairments" (*i.e.*, degenerative disc disease, hypertension, obesity, and cellulitis of the left foot) "significantly limit the ability to perform basic work activities as required by [Social Security Ruling] 85-28." (Tr. 20). But this statement does not suggest whether the ALJ thought Ms. Person's deep vein thrombosis and chronic venous insufficiency were not medically determinable or they did not significantly limit her ability to perform basic work activities (*i.e.*, they are not severe). While it is possible the ALJ intended to cover Ms. Person's deep vein thrombosis and chronic venous insufficiency with the severe impairment of cellulitis of her left foot, the decision does not indicate if that is so and those two are discrete conditions. *See Banik v. Comm'r of Soc. Sec.*, No. 1:11-cv-342, 2012 WL 2190816, at *6-7 (S.D. Ohio June 14, 2012) (differentiating chronic venous insufficiency from cellulitis), *report and recommendation adopted*, 2012 WL 2890890 (S.D. Ohio July 16, 2012).

The Commissioner asserts the ALJ nevertheless considered those impairments because the state agency medical consultants found Ms. Person's deep vein thrombosis to be a non-severe impairment and the ALJ adopted the limitations in the consultants' opinions. (*See* ECF #10 at PageID 1175). But the state agency medical consultants' opinions do not mention chronic venous insufficiency at all, and they differ in how they treated Ms. Person's deep vein thrombosis. While the state agency medical consultants on initial review did consider Ms. Person's allegation of deep vein thrombosis, the consultants on reconsideration did not. (*Contrast* Tr. 90, 103 *with* Tr. 116, 129). The state agency initial review does not list deep vein thrombosis among the medically determinable impairments. (*See* Tr. 95, 108). Presumably, the omission means the impairment was found to be not medically determinable. (*See* Tr. 119, 132) (listing in the table a medically determinable, but non-severe impairment). This difference frustrates any attempt to glean the

ALJ's reasoning at Step Two because the ALJ lumped all the state agency consultants' opinions together at Step Two. (*See* Tr. 22-23). Thus, I cannot determine whether the ALJ adopted the (presumed) initial finding that deep vein thrombosis was not medically determinable or adopted the reconsideration opinion that did not consider deep vein thrombosis. And these opinions say nothing about Ms. Person's chronic venous insufficiency.

Whether this omission requires remand or is harmless depends on whether the ALJ considered the functional impact of Ms. Person's deep vein thrombosis and chronic venous insufficiency at the later steps. *See Emard*, 953 F.3d at 852; *Maziarz*, 837 F.2d at 244. Much of the functional effects that Ms. Person argues flow from her deep vein thrombosis and chronic venous insufficiency began after she wounded her foot in January 2024. (*See* ECF #9 at PageID 1158-60; ECF #11 at PageID 1184-85). Ms. Person reported significant pain in her foot and difficulty walking. (ECF #9 at PageID 1158-59). She also must keep her left leg elevated to control swelling. (ECF #11 at PageID 1185).

The ALJ did analyze Ms. Person's foot pain at Step Four:

> The claimant's representative argued on the claimant's behalf at the hearing. She argued that the claimant's limitations worsened during the year prior to the hearing, partly due to increased pain in her neck and partly because of a January 2024 foot injury that resulted in cellulitis.
>
> * * *
>
> In January 2024, the claimant dropped a knife on her left foot while washing dishes. The knife caused a wound on her foot, and two weeks later, she went to an emergency room with complaints of foot pain and progressively worsening swelling, redness, and warmth, raising concerns for an infection. She was briefly admitted for intravenous antibiotics. Signs of infection and slow healing were seen in follow-up visits in February and March, necessitating continued treatment with antibiotics. By early April 2024, the swelling had improved and the size of the wound had decreased, but the claimant reported that her pain was no better. Continued pain was reported and continued healing was found in a June 2024 examination. The claimant's pain

> complaints to her doctor and her testimony regarding her foot pain have been considered in determining her residual functional capacity over the past year.

(Tr. 25, 26) (citations omitted).

The ALJ's statement that she considered Ms. Person's foot pain suggests she considered the functional impact of Ms. Person's deep vein thrombosis and chronic venous insufficiency. *See Emard*, 953 F.3d at 851. The ALJ then considered Ms. Person's reduced functioning by crafting a further reduced RFC post-August 2023 with greater limitations on the amount of standing and walking (four hours vs. six), balancing (occasionally vs. frequently), reaching (occasionally reach overhead, front, or laterally vs. no limitation), and exposure to workplace hazards (no exposure to unprotected heights and dangerous moving machinery vs. frequent exposure). (*See* Tr. 24). These differences between Ms. Person's functioning in the year leading up to the decision and her functioning before then suggest the ALJ did what she said: considered Ms. Person's foot pain. Though the ALJ stated the limitations came from the knife wound and Ms. Person contends they stem from her deep vein thrombosis and chronic venous insufficiency, the ALJ is tasked with assessing the claimant's functioning, not determining the precise medical cause of an impairment. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) ("[T]he RFC is meant to describe the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from.").

Thus, although the ALJ did not mention Ms. Person's deep vein thrombosis and chronic venous insufficiency, the ALJ considered the functional limitations from those conditions. Those conditions caused functional limitations by aggravating her foot wound and the ALJ expressly considered that injury by crafting a separate RFC for post-August 2023. Thus, the lack of any

analysis at Step Two of whether deep vein thrombosis or chronic venous insufficiency were severe impairments was harmless.

I thus decline to recommend remand on this basis.

**II. Listing 4.11**

Second, Ms. Person argues the ALJ erred in not evaluating whether she met or medically equaled Listing 4.11, the listing for chronic venous insufficiency. (ECF #9 at PageID 1163-65).

At Step Three, if the claimant's impairment meets or medically equals an entry in the Listing of Impairments, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F.App'x 488, 491 (6th Cir. 2010). The Listing of Impairments in Subpart P, Appendix 1 of the Social Security regulations describes those impairments "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F.App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 416.925(c)(3)). The claimant bears the burden to prove the impairment meets or medically equals a listing. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). To do so, the claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.* 93 F.App'x 725, 728 (6th Cir. 2004).

Whether a claimant's impairment medically equals a listed impairment is a decision reserved for the ALJ. 20 C.F.R. §§ 404.1526(e)(3), 416.926(e)(3). When considering whether a claimant's impairment meets or medically equals a listed impairment, an ALJ must evaluate the evidence, compare it to the relevant listed impairment, and give an explained conclusion to

facilitate meaningful judicial review, without which is it impossible to say the ALJ's decision at Step Three is supported by substantial evidence. *Reynolds*, 424 F.App'x at 416.

An "ALJ should discuss the relevant listing" when "the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 432 (6th Cir. 2014) (alteration in original). If the ALJ believes the evidence already received in the record does not reasonably support a finding that the claimant's impairment medically equals a listed impairment, the ALJ need not articulate specific evidence supporting the finding. *See* Social Security Ruling (SSR) 17-2p, 2017 WL 3928306, at *3 (Mar. 27, 2017). Generally, a statement that the claimant's impairment does not medically equal a listed impairment is sufficient articulation for the finding so long as the ALJ's articulation for why the individual is not disabled at a later step in the disability evaluation provides a rationale sufficient for a subsequent reviewer to determine the basis for the finding of medical equivalence at Step Three. *Id.*; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F.App'x 359, 366 (6th Cir. 2014) (looking to factual findings elsewhere in the ALJ's decision to affirm the medical equivalency determination at Step Three).

Listing 4.11 requires chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following:

> A. Extensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip.
>
> OR
>
> B. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.11.

The Commissioner argues Ms. Person has not met the requirements of Listing 4.11 because while she has stasis dermatitis, there is no evidence of superficial varicosities and she does not medically equal those requirements under SSR 17-2p because no medical source has opined as such. (ECF #10 at PageID 1176-77). Ms. Person replies that several out-of-circuit district courts have interpreted Listing 4.11 to require either superficial varicosities *or* stasis dermatitis; she does not advance evidence of superficial varicosities. (ECF #11 at PageID 1186-87).

Ms. Person's citation to out-of-district case law is not persuasive. For one, the plain text of Listing 4.11(B) uses the word "and," not "or": "Superficial varicosities, stasis dermatitis, *and* either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.11(B) (emphasis added). Because the Listing is written in the conjunctive, all three elements of superficial varicosities, stasis dermatitis, and sufficient ulceration are required. *Contrast United States v. Estrada*, 876 F.3d 885, 887 (6th Cir. 2017) ("Because the requirements are conjunctive, the alien must satisfy all three prongs") *with Stone v. Wingo*, 416 F.2d 857, 865 (6th Cir. 1969) (noting that when a statute is written in the disjunctive, "proof of any one" term "is sufficient").

Second, Ms. Person misreads the out-of-district cases she views as interpreting "Listing 4.11(B) to require either superficial varicosities <u>or</u> stasis dermatitis, <u>and</u> there must be evidence of a persistent/recurrent ulceration." (ECF #11 at PageID 1186-87) (emphasis in original) (citing *Blaine L. v. Kijakazi*, No. CV 22-9008, 2023 WL 6771360, at *4 (C.D. Cal. Oct. 12, 2023); *Podeszwa v. Kijakazi*, No. 3:21-cv-223, 2022 WL 4357434, at *6 (M.D. Ala. Sept. 20, 2022); *Dennis G. v. Kijakazi*, No. CV ADC-20-3148, 2021 WL 5087747, at *5 (D. Md. Nov. 2, 2021)). None of

the cases cited found Listing 4.11(B) satisfied with sufficient ulceration and only one of superficial varicosities or stasis dermatitis.

Ms. Person gets the most support from *Dennis* G. where the court ordered remand because the ALJ did not analyze Listing 4.11 despite evidence the claimant's chronic ulcer had not healed even with at least three months of persistent treatment. *See* 2021 WL 5087747, at *5. But the court there did not find Listing 4.11(B) satisfied solely because of the ulceration; rather the court "express[ed] no opinion as to whether Plaintiff is disabled" and found itself "unable to determine that the ALJ's decision is supported by substantial evidence." *Id.* This essentially articulates the ordinary proposition that an ALJ must discuss a listing "where the record raises a substantial question as to whether the claimant could qualify as disabled under a listing." *See Smith-Johnson*, 579 F.App'x at 432 (internal quotation omitted). But *Dennis D.* does not hold that ulceration alone is enough to raise a substantial question that a claimant meets Listing 4.11(B). The claimant in *Dennis D.* may also have satisfied Listing 4.11(A) due to extensive brawny edema. 2021 WL 5087747, at *5.

*Blaine L.* and *Podeszwa* do not support Ms. Person's position that Listing 4.11(B) can be satisfied with sufficient ulceration and only one of superficial varicosities or stasis dermatitis. Quite the opposite, they each found Listing 4.11(B) was *not met* because sufficient ulceration was lacking. *See Blaine L.*, 2023 WL 6771360, at *4-5; *Podeszwa*, 2022 WL 4357434, at *6. But when a list of requirements are expressed conjunctively, "all" prongs must be satisfied. *See Estrada*, 876 F.3d at 887. Thus, the absence of sufficient ulceration alone was fatal to the claimants' arguments in *Blaine L.* and *Podeszwa* they met Listing 4.11(B) and the courts did not have to analyze further.

That the courts in those cases chose not to discuss all three elements did not mean those courts would have found Listing 4.11(B) satisfied had there been evidence of sufficient ulceration.

Third, district courts within this circuit have treated Listing 4.11(B) as requiring all three elements of superficial varicosities, stasis dermatitis, and sufficient ulceration. *See, e.g.*, *Wooten v. Apfel*, 108 F.Supp.2d 921, 924-25 (E.D. Tenn. 2000) (finding Listing 4.11(B) not met despite evidence "plaintiff had superficial varicosities and chronic venous insufficiency in his lower extremities" because "there is no evidence of stasis dermatitis or recurrent or persistent ulceration which has not healed after three months of prescribed therapy."); *Stidham v. Astrue*, No. 3:10-cv-351, 2011 WL 2118076, at *7 (S.D. Ohio Apr. 14, 2011) (finding Listing 4.11(B) not met despite documentation "Plaintiff had stasis dermatitis and superficial varicosities" because "there is no documentation in the record that Plaintiff had either recurrent ulceration or persistent ulceration that had not healed following at least three months of treatment"), *report and recommendation adopted,* 2011 WL 2116452 (S.D. Ohio May 27, 2011); *Momany v. Comm'r of Soc. Sec.*, No. 2:17-cv-10626, 2019 WL 1503129, at *6 (E.D. Mich. Jan. 23, 2019) ("Plaintiff has failed to present any evidence of . . . 'superficial varicosities, stasis dermatitis, *and* either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment' that Listing 4.11 requires.") (emphasis in original), *report and recommendation adopted*, 2019 WL 1306164, at *4 (E.D. Mich. Mar. 22, 2019); *Christina B. v. Bisignano*, No. 3:25-cv-759, 2026 WL 2131137, at *5 (W.D. Ky. July 7, 2026) (finding the claimant does not meet Listing 4.11(B) solely due to lack of ulcerations), *report and recommendation adopted,* 2026 WL 2130943 (W.D. Ky. July 23, 2026).

The ALJ need not "discuss listings that the applicant clearly does not meet." *Smith-Johnson*, 579 F.App'x at 432 (internal quotation omitted). Listing 4.11(B) requires all three elements of superficial varicosities, stasis dermatitis, and sufficient ulceration. Ms. Person does not advance evidence (nor have I found any) that establishes she has superficial varicosities. (*See* ECF #9 at PageID 1164-65 (discussing only stasis dermatitis and ulceration); ECF #11 at PageID 1186-88 (arguing lack of superficial varicosities is legally irrelevant)). Her diagnoses of deep vein thrombosis and chronic venous insufficiency are not enough on their own as by regulation, a claimant "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §§ 404.1525(d), 416.925(d); *see also Wooten*, 108 F.Supp.2d at 925 ("A diagnosis of chronic venous insufficiency alone does not mean that the plaintiff's condition meets the severity requirements of Listing 4.11."). Thus, the ALJ did not err by omitting a discussion of Listing 4.11 because Ms. Person did not raise a substantial question she met the listing.

While it is possible for a claimant's impairment to medically equal a listed impairment even if the claimant does not meet one of the listing's requirements, that determination has its own evidentiary requirements that also are not met here. A claimant may still be found disabled at Step Three if the claimed impairment "medically equals" a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). A claimant with an impairment described in a listing but that "do[es] not exhibit one or more of the findings specified in the particular listing, or [the claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing" can still medically equal the listing. *Id.* §§ 404.1526(b)(1)(i), 416.926(b)(1)(i).

However, SSR 17-2p requires one of three types of evidence to support finding a claimant's impairment medically equals a listed impairment:

> 1. A prior administrative medical finding from a medical or psychological consultant from the initial or reconsideration adjudication levels supporting the medical equivalence finding.
>
> 2. Medical expert evidence, which may include testimony or written response to interrogatories, obtained at the hearings level supporting the medical equivalence finding.
>
> 3. A report from the Appeals Council's medical support staff supporting the medical equivalence finding.

2017 WL 3928306, at *3. If the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

Ms. Person raises medical equivalence and faults the ALJ for not engaging in the analysis, but she does not advance any of the required evidence (*see* ECF #11 at PageID 1187-88), nor does the record contain any. The state agency consultants did not find Ms. Person met or equaled Listing 4.11 (Tr. 96, 108, 119, 132), no medical expert evidence was obtained, and no Appeals Council report was ordered. Without that evidence, she cannot medically equal the listing and thus the ALJ did not need to articulate a specific finding.

I thus decline to recommend remand on this basis.

**III. Analysis of the medical opinions and FCE report**

Last, Ms. Person argues the ALJ misevaluated Dr. Adeniran's medical opinion as well as Dr. Kawalec's medical opinion and the December 2022 FCE report on which that opinion was based. (ECF #9 at PageID 1165). Specifically, she argues substantial evidence does not support the

ALJ's finding that Dr. Adeniran's opinion was vague because the opinion did propose specific limitations. (*Id.* at PageID 1166, 1168). The Commissioner responds the ALJ properly discounted Dr. Adeniran's opinion as vague and the limitations within only covered a five-month period and properly analyzed Dr. Kawalec's opinion and the FCE report as inconsistent with other medical evidence and Ms. Person's daily activities. (ECF #10 at PageID 1178-80).

As part of the RFC assessment, the ALJ must review all medical opinions and explain how persuasive she finds them. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," those being the two principal factors. *See id.* §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation," while consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* If the RFC assessment

conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). The reasons for the ALJ's conclusions must be stated in a manner permitting the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and substantial evidence supports that discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Ms. Person argues substantial evidence does not support the ALJ's finding that Dr. Adeniran's opinion was vague. (ECF #9 at PageID 1166). The Commissioner responds that any error in evaluating the opinion is harmless because Dr. Adeniran opined to limitations over a five-month period and thus does not meet the 12-month durational period for disability. (*See* ECF #10 at PageID 1179) (citing 20 C.F.R. § 404.1509 and SSR 23-1p, 2023 WL 8236247, at *2 (Nov. 7, 2023)). Ms. Person replies Dr. Adeniran's opinion should be read together with the two other FMLA forms and the functional capacity evaluation to be one opinion covering June 2022 through June 2023, meeting the 12-month duration requirement. (ECF #11 at PageID 1189).

On July 21, 2023, Dr. Adeniran reported "FMLA paperwork to be filled as patient unable to stand for prolonged periods and unable to lift heavy objects." (Tr. 461). The ALJ analyzed that opinion as follows:

> In a July 2023 treatment record, a family medicine doctor, Olufunso Adeniran, M.D., wrote that the claimant's FMLA paperwork would be "filled as [the claimant is] unable to stand for prolonged periods and unable to lift heavy objects." This opinion has limited persuasive value. The assessment of some limitations in standing and lifting was supported by Dr. Adeniran's findings of tenderness in the claimant's left upper back and positive tests for cervical nerve involvement. That assessment was

> consistent with the complaints and findings recorded by other doctors, and with the results of diagnostic imaging shortly after the alleged onset date. However, Dr. Adeniran's opinion is quite vague because [she] did not describe the claimant's limitations in vocationally specific terms.

(Tr. 28). Ms. Person argues that this finding is erroneous because Dr. Adeniran issued vocationally specific findings in the FMLA paperwork itself. (ECF #9 at PageID 1166). There, she opined that from May 1 to October 1, 2023, Ms. Person was unable to lift any weight for any amount of time; could perform repetitive motion or grip with her hands for 20 minutes each in a workday; and could never reach, bend, pivot, kneel, crawl, squat, sit, stand, walk, climb stairs, or climb stepstools. (*See* Tr. 410-11). These are clearly vocationally specific functional limitations.

But, as the Commissioner points out, Dr. Adeniran only opined Ms. Person faced such debilitating limitations for five months while disability requires work-preclusive limitations lasting 12 months or more. (*See* ECF #10 at PageID 1179 (citing 20 C.F.R. § 404.1509)). A medical opinion that a claimant can return to work before the required 12-month period cuts against a finding of disability. *See Lee v. Comm'r of Soc. Sec.*, 529 F.App'x 706, 713 (6th Cir. 2013); *Rebecca P. v. Saul*, No. 4:19-cv-5206, 2020 WL 4730979, at *12 (E.D. Wash. June 10, 2020) ("Temporary limitations are not enough to meet the durational requirement for a finding of disability."). Thus, even if the ALJ accepted the limitations as the opinion was written, it would not show disability because the limitations would expire seven months before the required 12-month period necessary to support finding a "disability." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The District Court could thus reject as harmless any error in evaluating Dr. Adeniran's opinion because remanding for proper analysis "would be an idle and useless formality." *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (quoting *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969) (plurality op.)).

Ms. Person replies that "Dr. Adeniran's opinion needs to be read in the context that Plaintiff had her FMLA extended by other doctors starting from her motor vehicle accident in July 2022 through May 2023." (ECF #11 at PageID 1189). Ms. Person cites no authority that multiple short-term work excuses from different doctors each finding disabling impairments lasting less than 12 months can be considered together. Other courts have suggested it is permissible as part of the ALJ's responsibility to review all the evidence about a claimant's impairments. *See Martin v. Comm'r of Soc. Sec.*, No. CV 17-12707, 2018 WL 4610877, at *7 (E.D. Mich. Aug. 21, 2018) (declining to read opinions together because there was insufficient evidence showing a continued disability), *report and recommendation adopted,* No. 17-12707, 2018 WL 4600225 (E.D. Mich. Sept. 25, 2018); *see also Rebecca P.*, 2020 WL 4730979, at *12 (The ALJ "must consider the cumulative impact of each of these short-duration opinions pertaining to Plaintiff's shoulder and neck injuries").

To the extent that Dr. Adeniran's opinion can be properly "viewed as a whole" alongside the other short-term FMLA leave forms that Drs. Kawalec and Gallagher prepared, then the ALJ's analysis for those forms would carry over. Regarding Dr. Kawalec's opinion and the functional capacity evaluation on which it was based, the ALJ found:

> In December 2022, the claimant participated in a functional capacity evaluation (FCE). Testing in that evaluation indicated that the claimant could lift 8 to 10 pounds, push/pull about 24 pounds, and carry 6.4 pounds. The claimant exhibited a slow and antalgic gait during the evaluation. She had difficulty walking on her toes and heels. She reported pain with simulated foot controls. She demonstrated a standing tolerance of 7 minutes during assembly and disassembly exercises, and a sitting tolerance of 60 minutes at a keyboard. Based on the testing, the evaluators, Jamie Hart, P.T., and Michelle Godek, A.T., Ph.D., assessed a capacity for working 3 to 4 hours a day, sitting 4 hours, standing 0 hours, walking 1-2 hours, occasionally lifting 10 pounds and carrying 6.4 pounds, pushing/pulling 24 pounds, occasionally grasping, occasionally kneeling and balancing, occasionally using foot pedals, and no bending/stooping, climbing stairs, crawling, or crouching. Weeks later, a treating

> doctor, Kevin Kawalec, M.D., wrote in a treatment note that these were the claimant's limitations.
>
> The opinions expressed in the FCE report and Dr. Kawalec's treatment note were supported by the test results recorded in the FCE, but they are not consistent with physical examinations done before and after the FCE. In an October 2022 medical visit, a doctor recorded findings of intact sensation and 5/5 motor function in both upper extremities. In a December 2022 doctor visit about a week before the FCE, Dr. Kawalec recorded findings of "no gross abnormalities of motor strength, balance, or gait." He noted tension in the muscles of the claimant's neck, back, and shoulders, but found that the claimant had "strength [of] 5/5." On the date that Dr. Kawalec adopted the limitations in the FCE report, he again recorded findings of tension in the neck, back, and shoulders, but normal strength, normal muscle tone, and "no gross abnormalities of motor strength, balance, or gait." In a November 2023 visit to another doctor, the claimant demonstrated a wide-based gait and some difficulty with heel-walking, toe-walking, tandem-walking, and balancing, but the examination was negative for decreased range of motion in her cervical spine, tenderness or spasms in her paraspinal muscles, muscle atrophy in the arms or hands, or significantly decreased sensation. Furthermore, the claimant's pain complaints have been managed quite conservatively, with pain medication and no invasive treatment, since the alleged onset date. The extreme limitations described by the FCE examiners and Dr. Kawalec are inconsistent with the record as a whole.

(Tr. 27) (citations omitted).

Ms. Person argues the ALJ's analysis was insufficient because the normal strength, balance, and gait findings the ALJ cited as inconsistent with the opinion do not contradict the opinion's restrictions about Ms. Person's use of her arms; and the ALJ selectively read her treatment history as conservative when she was repeatedly recommended for surgery. (ECF #9 at PageID 1168-70). The ALJ found "the FCE report and Dr. Kawalec's treatment note were supported by the test results recorded in the FCE" but nonetheless discounted the opinion because it was "not consistent with physical examinations done before and after the FCE." (Tr. 27). Substantial evidence supports this finding.

First, the October 2022 physical examination noted Ms. Person was sitting comfortably in a wheelchair and had intact sensation and full motor strength in her arms, but exquisite pain in

her legs. (Tr. 447). A reasonable mind might accept as adequate full strength in the arms as inconsistent with being limited to occasionally lifting at most 8 pounds over the shoulders or 10 pounds while seated in a chair and limited to push at most 10 pounds, pull at most 24 pounds and carry at most 6 pounds. (*See* Tr. 453); *see also Besaw*, 966 F.2d at 1030 (defining substantial evidence).

Second, the December 2022 examination (conducted about a week before the FCE) noted no gross abnormalities of motor strength, balance, or gait; mild upper-extremity weakness; limited extension and flexion of her shoulders due to pain; and significant tension in her neck, back, and shoulders. (Tr. 449). Like with the October examination, a reasonable mind might accept as adequate the lack of gross abnormalities in motor strength and only mild arm weakness as inconsistent with the lifting, pushing, pulling, and carrying limitations. Similarly, a reasonable mind might accept no gross abnormalities in gait and full muscle strength as inconsistent with being limited to standing for no more than 5 minutes at a time and walking occasional short distances. (*See* Tr. 453).

Third, the November 2023 examination noted a wide-based staggering gait, impaired tandem gait, diffuse weakness in her arms and legs, 4/5 muscle strength in the arms and legs, and no muscle atrophy in the arms. (Tr. 488-89). A reasonable mind might also accept that the diffuse weakness, 4/5 muscle strength, and no muscle atrophy each in the arms as inconsistent with the limitations occasionally lifting at most 8 pounds over the shoulders or 10 pounds while seated in a chair and limited to push at most 10 pounds, pull at most 24 pounds and carry at most 6 pounds. While Ms. Person points out those same facts support substantial limitations in her upper extremities (ECF #9 at PageID 1169-70), when the evidence goes both ways, the substantial-

evidence standard preserves a "zone of choice" in which the Commissioner can act without fear of court interference. *Mullen*, 800 F.2d at 545.

In addition to the examination reports, the ALJ found the opinion inconsistent with the fact "the claimant's pain complaints have been managed quite conservatively, with pain medication and no invasive treatment, since the alleged onset date." (Tr. 28). Ms. Person argues this does not accurately summarize her treatment history because she has used multiple mobility devices, she has been recommended surgery multiple times, and her pain has persisted despite medication. (ECF #9 at PageID 1170). An ALJ may reasonably discount a medical opinion's proposed limitations because, among other things, the claimant was receiving conservative treatment. *See Lester v. Soc. Sec. Admin.*, 596 F.App'x. 387, 389 (6th Cir. 2015). Treatment for pain is generally conservative when it does not involve surgery. *See Taylor v. Comm'r of Soc. Sec.* No. 5:22-cv-1635, 2023 WL 4534536, at *3 (N.D. Ohio June 27, 2023) (observing conservative treatment includes physical therapy, activity modification, oral medication, and epidural injections but not surgery).

Here, the record is mixed on why Ms. Person did not pursue cervical surgery. Surgery was first recommended for her after her initial hospitalization after the July 2022 motor vehicle accident but she "ultimately declined surgical management." (Tr. 763). She later reported she was "not psychologically prepared for" surgery. (Tr. 436). Then in September 2022, she was reportedly ready to reach out to a neurosurgeon. (Tr. 440-41). But by January 2023 she was overwhelmed by the neurologist's suggestion of spinal surgery "as the only realistic option." (Tr. 453). She had a repeat consultation in January 2023 (*id.*) and was again recommended cervical surgery in November 2023 (Tr. 489-90). There is no further mention of surgery in the medical records,

though Ms. Person testified she accidentally dropped the knife into her foot in January 2024 sometime before she was scheduled to have the procedure. (*See* Tr. 52). The record does not indicate whether her ongoing foot and vascular issues meant she could not receive cervical surgery. At most, the record shows Ms. Person had declined surgery despite her conditions from July 2022 through November 2023. Then at some point before January 2024, she had scheduled the surgery, but it did not proceed before the hearing in August. Thus, for most of the relevant period, the ALJ's finding was correct and Ms. Person's conditions were treated conservatively with cervical surgery repeatedly recommended but declined or delayed.

Last, in her reply, Ms. Person contends:

> Moreover, the ALJ fails to properly discuss how Plaintiff's imaging showing severe central canal stenosis at C5-C6 and significant spinal cord compression, is inconsistent with the functional limitations provided in this FCE, including limitations to occasional lifting and occasional handling. There are no limitations pertaining to handling in the RFC despite this evidence. Due to the ALJ's improper evaluation of the medical opinion evidence, the decision should be reversed and remanded.

(ECF #11 at PageID 1190) (citations omitted). If Ms. Person is raising a separate argument that the RFC lacked substantial evidence because it does not contain a limitation in handling or fingering, I recommend the District Court find that argument waived because new arguments cannot be raised for the first time in a reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). If Ms. Person is arguing the ALJ should have found the medical opinions persuasive because they are consistent with her diagnoses and the imaging, the court cannot reweigh the evidence and apply the persuasiveness factors anew. *See Brainard*, 889 F.2d at 681.

I thus decline to recommend remand on any of these grounds.

## CONCLUSION AND RECOMMENDATION

After reviewing the record, the parties' arguments, and the law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: October 7, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).**